**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**David M. TORRES, a/k/a Michael Williams, Appellee.**

Superior Court of Pennsylvania.

Submitted Jan. 5, 1998.

Filed June 12, 1998.

Michael Streily, Deputy District Attorney, Pittsburgh, for the Commonwealth, appellant.

Kevin G. Sasinoski, Pittsburgh, for appellee.

Before POPOVICH, STEVENS and MONTEMURO*, JJ.

POPOVICH, Judge:

■ The Commonwealth appeals an order suppressing evidence seized pursuant to a search warrant held invalid and excluded from the appellee's (David M. Torres, a/k/a Michael Williams') trial.[1] We reverse.

The warrant in questions reads as follows:

COMMONWEALTH OF PENNSYLVANIA
COUNTY OF ALLEGHENY
AFFIDAVIT FOR SEARCH WARRANT

DATE OF APPLICATION: FEB. 21, 1996[.] DATE OF VIOLATION: FEB. 18, 1996[.]

Probable cause belief is based on the following facts and circumstances:

Your affiants are Detectives assigned to the Homicide Unit of the Allegheny County Police Department. All of the information contained in this affidavit was learned directly by your affiants, or relayed to your affiants by other police officers involved in this investigation.

On the evening of February 18, 1996, the Wilkinsburg Police Department requested investigative assistance from the Allegheny County Police Homicide Unit. This request was in regards [sic] to a recent shooting incident that occurred in the 1100

---

* Retired Justice assigned to the Superior Court.

1. This Court has the authority to hear the present appeal with the Commonwealth's good faith certification that the suppression order substantially handicaps and terminates the prosecution of the appellee. *Commonwealth v. Dugger*, 506 Pa. 537, 486 A.2d 382 (1985).

block of Sperling Street in Wilkinsburg. It was subsequently learned that there were three (3) victims in this case, and all of the shooting victims were pronounced dead at the scene by Emergency Medical Personnel. The victims were all shot while seated in a parked 1982 Ford Bronco. The victims were Timothy A. Moore, B/M/25, Joel MOORE, B/M/19, and Robert JAMES, B/M/33. The investigation revealed that two armed suspects approached the victim's vehicle, and that the suspects then fired numerous gunshots into the victim's. [sic]

During the course of this investigation, it was learned that the three victims were involved in drug related activities. It was also learned that the victims had made a recent drug deal(s) with individuals known to frequent the Wilkinsburg/East Liberty Section of Allegheny County.

Numerous interviews have been conducted in this case. The identity of these witnesses is known to your affiants. These witnesses will be available to testify at any necessary court proceedings. It was collectively learned through these witnesses that several days prior to the shooting incident, Timothy MOORE (victim), made a crack cocaine drug deal with individuals that he knew as "BOB" and "MIKE". Bob and Mike previously indicated that they were brothers, and they were from New York. It was learned that the drug deals in question were set up through the use of telephone pagers. The telephone pager numbers for Bob and Mike were # 574-5647 and # 574-1745 respectively.

It was learned that during the investigation that "Bob" had a home telephone number of # 661-4862. This telephone number is listed to a David Michael TORRES of 5631 Rippey Street, Apt. C-2, Pittsburgh, PA 15206. This apartment is located in the East Liberty Section of Pittsburgh. The age of Torres is consistent with the approx. age of "Bob" (as given by various witnesses).

The investigation revealed that on the evening in question, the victims agreed to meet with BOB and MIKE in Wilkinsburg to settle a drug related debt. It was re-ported that Tim MOORE had previously paid Bob and/or Mike approx. $2,300 for crack cocaine, but that Moore was not given any drugs in return for the money. The victims were to meet Bob and Mike at approx. 8:30 PM (2-18-96) in a parking lot of a Texaco Gas Station in Wilkinsburg. The purpose of the meeting was to resolve the dispute over the aforementioned crack cocaine deal. Witnesses indicated that the victim's departed from the New Stanton area of Westmoreland County for Wilkinsburg at approx. 8:00 PM. It should be noted that the planned meeting place for the drug deal was in close proximity to the shooting scene.

During the investigation, your affiant learned through witnesses that the suspects, (BOB/MIKE) lived in the area of Rippey Street in the East Liberty Section of Pittsburgh. It was also learned that Bob and Mike lived with a relative known as "X". The investigation revealed that David MICHAEL TORRES resides at 5631 Rippey Street, Apt. C-2 and that two relatives lived at that same address. These relatives are Robert TORRES, AKA "BOB" Torres, and Xavier TORRES. Robert Torres lives in apartment # C-5, while Xavier resides in apartment B-3.

During a recent surveillance of the apartment building in question, a vehicle was found to be parked in front of the structure. This vehicle had a New York license plates [sic] affixed to it. The description of this car was consistent with the description of the suspect car that was observed fleeing the shooting scene.

Based on the above facts and circumstances, your affiants respectfully request a Search Warrant for the above listed residence.

The affidavit was signed by an issuing authority and executed by the police. A search of the premises on the 21st of February, 1996 produced two guns, an undetermined amount of U.S. currency, a box of cartridges, a television, two phones, two remote controls, paraphernalia and miscellaneous papers with the names Robert Torres and David Torres.

The appellee was charged with three counts of criminal homicide. The appellee's counsel filed an Omnibus Pre–Trial Motion seeking suppression of the evidence found in the Rippey Street Apartments (C–2). The court suppressed the evidence seized from the apartment. This appeal followed claiming the court erred in excluding the evidence seized because the warrant was defective "concerning the source, basis or reliability of the unnamed sources and information obtained from those sources."

When reviewing the Commonwealth's appeal from the decision of a suppression court, we must consider "only the evidence of the defendant's witnesses and so much of the evidence for the prosecution as read in the context of the record as a whole remains uncontradicted." *Commonwealth v. Elliot,* 416 Pa.Super. 499, 611 A.2d 727, 728 (1992). Further, this Court's responsibility is "to determine whether the record supports the factual findings of the court below and the legitimacy of the inferences and legal conclusions drawn from those findings." *Commonwealth v. Elslager,* 349 Pa.Super. 217, 502 A.2d 1354, 1358 (1985). And, lastly, "[a] reviewing court must pay great deference to an issuing authority's determination of probable cause for the issuance of a search warrant." *Commonwealth v. Woods,* 404 Pa.Super. 432, 590 A.2d 1311, 1313 (1991).

It is the position of the suppression court and the appellee alike that the search warrant was flawed in failing to include sufficient information to establish probable cause to search the Rippey Street Apartments (C–2), in failing to establish the reliability of the sources of the information and in failing to establish the time-frame within which the information was obtained.

Examining the last argument first, we note the affidavit provided the date the triple murders occurred (Feb. 18) and the date the search warrant was sought (Feb. 21). Accordingly, reading the affidavit in a common sense fashion, we hold the District Justice was provided with a clear time-period (3 days) within which to assess when information underlying the warrant was obtained. Contrast *Commonwealth v. Kalinowski,* 303 Pa.Super. 354, 449 A.2d 725 (1982). This

undermines the appellee's argument to the contrary and establishes, in proximity to the murders, *when* the information was gathered.

The remaining two issues complain that the absence of "how" the information was obtained by the unnamed witnesses and their reliability invalidate the search warrant.

In *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the United States Supreme Court abandoned the "two-pronged test" for assessing the sufficiency of search warrant affidavits established by *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). In the course of doing so, the Court explained in relevant part:

> [T]he "two-pronged test" directs analysis into two largely independent channels—the informant's "veracity" or "reliability" and his "basis of knowledge." There are persuasive arguments against according these two elements such independent status. Instead, they are better understood as relevant considerations in the totality-of-the-circumstances analysis that traditionally has guided probable-cause determinations: a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability.

> \* \* \* \* \* \*

> Unlike a totality-of-the-circumstances analysis, which permits a balanced assessment of the relative weights of all the various indicia of reliability (and unreliability) attending an informant's tip, the "two-pronged" test has encouraged an excessively technical dissection of informants' tips, with undue attention being focused on isolated issues that cannot sensibly be divorced from the other facts presented to the magistrate. \* \* \* "[T]he term 'probable cause,' according to its usual acceptation, means less than evidence which would justify condemnation.... It imports a seizure made under circumstances which warrant suspicion." More recently, we said that "the *quanta* ... of proof" appropriate

in ordinary judicial proceedings are inapplicable to the decision to issue a warrant. Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision. While an effort to fix some general, numerically precise degree of certainty corresponding to "probable cause" may not be helpful, it is clear that "only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause."

*Gates,* 462 U.S. at 233, 234–235, 103 S.Ct. 2317 (Citations omitted; footnote omitted).

Additionally, *Gates* provides insight into the treatment of anonymous tips, which we equate to be the case here in the absence of any "named" tipster appearing in the search warrant application.

In *Gates,* an anonymous handwritten letter was received by Bloomingdale police which identified a married couple (the Gates) involved with drug sales. The letter detailed where the Gates lived and that their drug buys were completed in Florida. The author of the letter detailed the manner in which the wife drove to Florida, received drugs and drove back to the Chicago area with her husband who would fly to the destination.

The police confirmed the husband was issued an Illinois driver's license and resided at a specific address in Bloomingdale, Illinois. The police also learned the husband had reserved a flight from Chicago to Florida two days after the wife had scheduled to drive to Florida. Surveillance confirmed that the husband boarded a flight and arrived in West Palm Beach and occupied a room registered to Ms. Gates. The morning after arrival, the husband left with a woman in a vehicle with Illinois plates and drove to the Chicago area. The vehicle was titled to Gates. A search warrant was granted upon the detailed account of police surveillance and the contents of the anonymous letter. A search of the Gates' vehicle produced 350 lbs. of marijuana and a search of the home unearthed contraband.

In reversing the Illinois Supreme Court's affirmance of the suppression order, the United States Supreme Court wrote that the range of details in the letter, when coupled with the forecast of the Gates' future conduct, was of such a character that it "was not unlikely that [the unidentified informant] also had access to reliable information of the Gates' alleged illegal activities." *Gates,* 462 U.S. at 245, 103 S.Ct. 2317. Also, the Court remarked that "an affidavit relying on hearsay 'is not to be deemed insufficient on that score, so long as a substantial basis for crediting the hearsay is presented.'" *Id.* at 241–242, 103 S.Ct. 2317.

Here, consistent with *Gates,* we find a detailed account of the conduct of the victims and their assailants preceding the murders, the manner in which the killings occurred and the motive. Moreover, the police were provided with names, pager numbers and an address intertwined with the appellee and his co-hort (Robert "Bob" Torres), both of whom were alleged to have traveled from New York and resided in the Rippey Street Apartments (C–2). A further indicia of reliability was the police surveillance of the Rippey Street Apartments, which produced a vehicle matching the get-away-vehicle used in the shootings and parked outside the building.

Thus, the anonymous tipsters provided the police with the following data: 1) the victims knew their assailants; 2) the assailants were brothers from New York; 3) the assailants were drug dealers whose pager numbers were provided to police; 4) the appellee's brother's telephone number was disclosed to police; 5) the assailants lived in the Rippey Street Apartments (C–2); 6) the killings were over a drug debt of $2,300; and 7) a meeting to resolve the debt was set for the time and near the place were the killings ultimately occurred.

■ It is true, that each of the preceding factors viewed in isolation would not give rise to the probable cause necessary to authorize a search of the appellee's apartment. However, in concert the level of probable cause to validate the search warrant is satisfied and comports with *Gates'* totality-of-circumstances test. Therefore, we hold that police corroboration of the substance of the tips (we label them as such because their source and identity were not disclosed within the four

corners of the affidavit) was sufficient to establish the reliability of the informants. *Commonwealth v. Price,* 318 Pa.Super. 240, 464 A.2d 1320 (1983).

■ The fact that the police withheld the informants' names (acknowledging their production at any subsequent court hearing) is *not inimical to the propriety of the search warrant.* Neither is the status of the informants as untested, first-time confidantes of the police, nor does the assignment of any hearsay attributed to their reports shake the foundation of the warrant. Rather, we read *Gates* as creating no barrier to police use of hearsay information by unnamed informants, provided it is of a detailed nature allowing for corroboration by police.

At bar, on the basis of the facts recited in the affidavit and the corroboration of the same by the independent investigation of police, "a fair probability that contraband ... [would] be found in a particular place" was a reasonable conclusion drawn by the District Justice. *Gates, supra,* 462 U.S. at 238, 103 S.Ct. 2317. Having so held, our duty has been met by ensuring the District Justice had a "'substantial basis for ... conclud[ing]' that probable cause existed." *Id.* We are convinced the search warrant did not violate the appellee's Fourth Amendment rights to be free of unreasonable searches and seizures. The suppression court's order being to the contrary, we reverse.

Order reversed; jurisdiction is relinquished.